UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHALINE JO NEVIEW and
HIAL JAMES NEVIEW,

                    Plaintiffs,

                                            Case Number 07-12302
v.                                          Honorable Thomas L. Ludington

D.O.C. OPTICS CORPORATION,
*d/b/a as D.O.C.*,

                    Defendant.
_____/

### OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE

On May 29, 2007, Plaintiffs Michaline Jo Neview ("Plaintiff") and Hial Jo Neview ("Plaintiff's Husband") filed a complaint alleging various employment discrimination and tort claims. Dkt. # 1. Defendant D.O.C. Optics Corporation ("Defendant") employed Plaintiff as a manager of a retail location selling prescription eye wear. On January 24, 2006, Defendant discharged Plaintiff, it alleges, for displaying erratic and inappropriate behavior in customers' presence. Plaintiff alleges that it terminated her employment because of her age, her gender, and the fact that she was disabled by post traumatic stress disorder ("PTSD"). For the reasons stated below, the Court will **GRANT** Defendant's motion for summary judgment.

I

A

Defendant was a retail optical company[1] providing eye exams and selling contact lenses and eyeglasses to the general public. Defendant operated approximately fifty retail locations in

_____

[1] In February of 2006, Defendant sold its assets to a competing operator of retail optical company.

Michigan, including stores in Bay City and Saginaw.  Prior to joining Defendant, Plaintiff had twenty-two years of employment experience, mostly as a pharmacy technician.  Dkt. # 61-3.

Plaintiff began her employment tenure with Defendant on August 1, 2002 as an optical dispenser, earning $9.50 an hour.  Dkt. # 52-7 at 2.  In April of 2003, Defendant promoted Plaintiff to assistant manager of its Bay City store, earning $12.00 an hour.  *Id.*  On November 9, 2003, Defendant promoted Plaintiff to office clinic manager of its Midland store, earning an annual salary of $29,000.00.  *Id.*  On April 1, 2005, her annual salary increased to $34,000.00.  *Id.*  Defendant's records indicate that Plaintiff's "last day worked" was January 20, 2006.  Plaintiff asserts that Defendant officially discharged her on January 24, 2006.

Plaintiff contends Defendant did so because of her age, her gender, and her disability. Defendant disputes that assertion, contending that it discharged Plaintiff for performance-related issues.

The key responsibilities of an office clinic manager included: oversight of store operations, sales, and profitability; management of store personnel; and enforcement of employee-discipline procedures.  Dkt. # 52-15.  Defendant considered "excellent customer service and communication skills" to be a requirement of the position.  *Id.*

An April 2004 performance evaluation described Plaintiff as "an energetic, goal-oriented Manager" who "[e]ffectively carries out company initiatives and accepts responsibility for compliance."  Dkt. # 52-8 at 4.  Notwithstanding those positive remarks, the evaluator recommended that Plaintiff "[s]hould strive to prevent emotions from interfering with reactions to issues that come up with employees or customers."  *Id.*  During her tenure as manager, total sales increased annually.

*Id.* Plaintiff received an overall evaluation score of seven on a nine-point scale. *Id.* A July 2005 evaluation rated Plaintiff's performance as an eight out of nine. Dkt. # 61-10.

B

Plaintiff contends that two employees, William Baird and Michael Flynn, had inappropriate conversations at the Midland store beginning in January 2005. Dkt. # 61-34 at 43. Allegedly, authorities prosecuted Baird for sexual misconduct with a fourteen-year-old girl. *Id.* Plaintiff recounted the first instance of Baird's inappropriate behavior as follows:

> Q.    So it was mostly conversations you are saying that occurred?
>
> > A.    Conversations, things that I would overhear. Things I overheard. Also things that would be directly said to me when he first got arrested, I think that he was trying to convince me that he didn't do anything wrong and he described in vivid detail about how this young girl seduced him and it wasn't his fault and he couldn't control himself.

*Id.* Plaintiff acknowledged soliciting information from Baird concerning the circumstances of his arrest:

> A:    I asked him how things were going, yes, I wanted to know the details of what had happened. I felt that it was my business since he was arrested right in front of the store and he told me that he was arrested for I think it was four counts, but I'm not sure on that, of sex with a minor and he described specifically what she had done to seduce him and at the time I was really shocked by it. I was really -- I was just taken aback. I was very busy. I had two -- I basically walked away from him after he told me that and went up front and went to work.

*Id.* Baird described how the minor "took her breasts out of her bra and [Baird] sucked on them and he couldn't control himself." *Id.* at 48. During this conversation, "tears of regret [were] pouring down his face" and Plaintiff believed that Baird was attempting to "convince [her] that he was innocent" of the charge because she was an "understanding" person. *Id.* at 48-49.

-3-

Plaintiff also recalled a discussion of a consensual sexual relationship between Baird and a colleague, but acknowledged that it was not harassment directed towards her. *Id.* at 48. In addition, Plaintiff described a conversation between Baird and Flynn:

> A.     And then after that he was really good friends with the lab manager, Mike Flynn, and Mike was right in the middle of it, I would say involved because they were friends, and I just remember walking back in to the lab one day for, I don't know, something to do with a pair of glasses and walking in and they were having a conversation about this girl and they were talking about what I heard was she's done this before and she is sexually, I can't think of the word where she was sexually aggressive, I guess, and Michael Flynn at that point in time said we think her father is whoring her out, he said to me that specific sentence and I didn't answer, I didn't respond, I walked away.

*Id.* at 44-45. Baird also raised the incident with the minor when requesting Plaintiff to write a letter on his behalf to the judge sitting on his criminal case. In total, Plaintiff estimated that Baird raised the incident at least five times over approximately a month-long period. *Id.* at 49.

In another instance, Flynn told Plaintiff that she had "booby ash" after returning from a cigarette break, but Plaintiff considered that to be a joke. *Id.* at 47. Flynn also shared a letter from his wife expressing their marriage embraced an open sexual lifestyle. *Id.* Although Plaintiff viewed the letter as "tasteless," she did not perceive it as directed towards her. *Id.*

As manager, Plaintiff retained the authority to discipline employees for inappropriate conduct and language, but she did not discipline either Baird or Flynn at that time. *Id.* at 45. Plaintiff never reprimanded Baird. Other employees at the Midland store found Flynn's conduct to be inappropriate and Plaintiff did warn Flynn twice orally and once in writing. *Id.* at 47-48.

In addition, Plaintiff testified that she was aware that Baird had been arrested and requested permission from her district manager, Jody McGill, to terminate his employment. Dkt. # 61-34 at 43-44. McGill instructed Plaintiff to retain Baird because the inappropriate conduct was an

-4-

allegation at that point. *Id.* Plaintiff did not inform McGill of her past traumatic experience or express concern that she may be affected by Baird's continued presence. *Id.*

On November 30, 2005, Plaintiff sought psychiatric treatment. Dkt. # 52-28 at 2. A medical report noted "childhood sexual abuse coming up in conflicts [with] abusive husband." *Id.* The report did not indicate problems occurring at her place of employment. *See generally id.*

On January 23, 2006, Douglas Foster, M.D. authored a letter to whom it concerned indicating that Plaintiff suffered from depression and PTSD. Dkt. # 52-27 at 2. At that time, Dr. Foster believed that Plaintiff was "having an outbreak of the PTSD symptoms and [would] need to be excused from work" for care and treatment. *Id.*

On December 11, 2006, Kishore Kondapaneni, M.D., drafted a letter to whom it concerned concerning Plaintiff's depression and PTSD. The letter indicated that Plaintiff suffers from "significant childhood traumas that tend to trigger off when she encountered with her employee." Dkt. # 61-11.

C

Two alleged incidents serve as Defendant's primary justification for Plaintiff's discharge. First, Defendant's auditor, Charleen Kling, documented alleged inappropriate conduct that occurred on January 13, 2006. Dkt. # 52-12 at 2. According to Kling, Plaintiff orally expressed frustration to subordinate employees on the sales floor and was argumentative with a customer. *Id.* Kling described Plaintiff's behavior towards customers as "rude," "defensive[]," and "harsh." *Id.* at 2-3. Plaintiff described that customer interaction as follows:

> I had already given him a refund when he first walked up to the counter. He asked for a refund and I gave him a refund immediately and I did not refuse to give him a refund. I gave him a refund immediately and then I sat down with him and tried to explain to him but he did not understand.

-5-

Dkt. # 61-34 at 26.  Plaintiff denied being "defensive" or "rude" with the customer.  *Id.* at 26-27.

In addition, Plaintiff disclosed to Kling that she suffered from some personal "medical issues."  Dkt. # 52-12 at 2.  Plaintiff had likewise informed the district manager of her diagnosis and related symptoms in December of 2005.  Dkt. # 61-34 at 17.

Second, on January 20, 2006, Plaintiff allegedly exhibited improper conduct while in the presence of customers at the Midland store when she began crying at the store's front desk.  Dkt. # 52-29  at 3.  Colleagues escorted her to the backroom, where "she began kicking walls and repeating that she would like to hurt someone."  *Id.*  Plaintiff recalled the incident as follows: "I believe I was standing at the front counter.  I was not waiting on anyone.  I remember standing at the front counter looking across at the wall and that's the last memory that I have until I am in the back room."  Dkt. # 61-34 at 27.

Plaintiff's colleague, Roxanne Pacholka, described the incident as a "breakdown" or "panic attack."  Dkt. # 61-35 at 16.  Prior to the incident, Plaintiff said that she needed to leave the front counter and retrieve medication in the back of the store.  *Id.*  Before she did so, Plaintiff became "visibly upset" and "began kicking the counter."  *Id.*  While Plaintiff appeared "outraged" and "angry," Pacholka did not believe that Plaintiff's emotions were directed at anyone in particular.  *Id.* at 17-18.

Pacholka noticed Plaintiff become more easily affected my "emotional issues" and a decline in her professionalism.  *Id.* at 18.  Plaintiff began "losing her patience more often with the staff."  *Id.*  In addition, Pacholka recalled "a customer getting pretty nasty with [Plaintiff] . . . and [Plaintiff] getting pretty nasty back."  *Id.*

On the same day, Defendant's human resources manager, Cheryl Maxwell, placed Plaintiff on a four-day suspension. Dkt. # 52-10 at 3. The "employee disciplinary action" form noted that "[Plaintiff] received 3 written customer complaints concerning her argumentative attitude [and] lack of respect for customers. She was also witnessed behaving unprofessionally and erratically by [Defendant's] auditor. Auditor [sic] also heard her speak in an unprofessional manner to staff." *Id.* Defendant suspended Plaintiff for four days and indicated it would investigate further. *Id.* The form indicated that "[i]f performance does NOT improve, the next step will be: final warning." *Id.*

On January 24, 2006, Defendant terminated Plaintiff's employment. Dkt. # 52-10 at 2. Maxwell provided the following summary of events:

> [Plaintiff] was placed on four day suspension January 20, 2006 due to customer service issues and emotional instability . . . January 20, 2006, [Plaintiff] began crying while at the front desk, was taken to the break room and began kicking the walls and repeating she would like to hurt someone. Her husband was called to escort her home. It was also reported that [Plaintiff] on several occasions had 'meltdowns' while at work and left early not completing her shift.

> [Plaintiff] was terminated January 24, 2006 by Cheryl Maxwell, HR Manager and Melissa Anderson, District Manager.

> Numerous confidential complaints were made in the month prior to her termination concerning her behavior towards staff and customers. Charlene Kling, [Defendant's] auditor, had also witnessed harsh behavior towards customers and staff while in the store completing an audit . . . It was reported that on many occasions [Plaintiff] had made degrading remarks and comments concerning staff while on the floor. These incidents took place many times when customers could witness or overhear the conversations. Employees began to report they were fearful of [Plaintiff] and her actions. She also told her staff she had developed mental problems, however, doctor notification of these issues was not received at corporate until Monday, January 23, 2006, following her suspension. Three written customer complaints referring to her behavior were received the week of January 16-20, 2006. January 24, 2006 [sic] [Plaintiff] phoned Mark Bruseloff to ask for disability paperwork; however, the decision to terminate [Plaintiff] had been decided prior to the call.

-7-

*Id.* Anonymous customer comment cards documented Plaintiff's alleged improper behavior. Dkt. # 52-11.

Defendant's CFO stated that he decided to discharge Plaintiff on January 20, 2006 because of reports of "customer and employee complaints concerning Plaintiff's aggressive and unprofessional conduct, and Plaintiff's outburst at the front desk of the Midland store." Dkt. # 52-16 at 5. Defendant's CFO contended that he was unaware of any request by Plaintiff for a leave of absence due to a medical condition, but conceded that Defendant only informed Plaintiff of her discharge on January 24, 2006. *Id.*

After her discharge, Plaintiff sought worker's compensation benefits. On February 5, 2008, Plaintiff testified that she was unable to maintain emotional stability or maintain focus. Dkt. # 52-33 at 5-7. Plaintiff also testified that she was unable to be alone in public, and on some days was unable to leave her front porch. *Id.* at 8-9. She also denied that she could perform any of her past, full-time employment. *Id.*

On March 26, 2008, Michigan's Department of Labor & Economic Growth determined Plaintiff to be entitled to worker's compensation from Defendant. Dkt. # 52-32 at 2. The administrative law judge found as follows: "I find that Plaintiff is unable to work in any capacity at this time and therefore has a disability as defined by the Act . . . I find that Plaintiff is disabled from all gainful employment." *Id.* at 3. Defendant was obliged to pay benefits until August 1, 2006. *Id.* at 4.

### D

According to Defendant's former chief financial officer, James Lies, Defendant's managerial compensation was based on multiple factors, including education, retail experience, optical

-8-

experience, length of service, store size, and store volume. Dkt. # 52-16 at 3. Managers also were eligible for performance bonuses. *Id.* Lies denies that age, gender, or any discriminatory factor affected a manager's salary. *Id.*

Plaintiff contends that male managers were preferred by Defendant despite being similarly-situated. Defendant disputes this allegation with respect to two better compensated male managers. First, Mika Gronquist, born in 1962, managed Defendant's largest store with twice the volume of sales, had five more years of employment experience with Defendant than Plaintiff, and an advanced degree in optometry obtained in a foreign country. Dkt. # 52-16 at 3. Second, Randy Jendrzejewski, born in 1955, had three more years employment experience with Defendant and his 2005 base salary was $35,020 – $1,020 higher than Plaintiff's 2005 base salary. *Id.* Another male manager earned an equivalent salary. *Id.* Plaintiff's salary was greater than a fourth male manager with fifteen years more experience. *Id.*

At this time, Defendant's highest paid manager was female. Dkt. # 52-18. In addition, ninety percent of managers were female. *Id.* Defendant employed three female managers that were older than Plaintiff. Dkt. # 52-19 at 2. Each began their employment with Defendant at least six years before Plaintiff. *Id.* Plaintiff's salary was greater than two of those managers. *Id.*

In March of 2006, Defendant hired Tammy Spangler, born in 1977, to manage the Midland and Bay City stores. According to Defendant's CFO, Spangler's base salary was $42,000.00 because of her "extensive retail experience and the fact that she was managing two stores." *Id.*

E

Defendant's rules and regulations governed Plaintiff's employment. Dkt. # 52-5. With respect to inappropriate conduct with customers, it provides as follows:

-9-

Discourtesy to customers, vendors or others for any reason whatsoever including insulting, sarcastic, negative, angry words or attitude towards customers and permitting patients or customers to overhear such comments when conversing with others.

1st Violation    -    Up to and Including Discharge

*Id.* at 5.  Defendant contends that Plaintiff was discharged for violating this rule.  Dkt. # 52-16 at 6.

Defendant also maintained a sexual harassment policy that prohibited "conduct that creates intimidating/offensive workplace interfering with work performance."  Dkt. # 52-6 at 2.  The policy directs "[a]ny employee who feels he or she is a victim of unlawful harassment should report the matter to the attention of his or her Supervisor immediately."  *Id.*  In response, Defendant would investigate the allegations and take "appropriate investigative action if warranted."  *Id.*  In addition, the policy indicates that "[n]othing stated in this policy alters the 'at-will nature of employee's employment."  *Id.*

The parties have not indicated that Plaintiff had an employment contract or provided same. Defendant contends Plaintiff was an "at-will" employee.  Plaintiff contends that representations by Defendant converted the contract to "just-cause."

F

On November 3, 2006, Plaintiff filed a charge of discrimination with the Michigan Department of Civil Rights ("MDCR") and the Equal Employment Opportunity Commission ("EEOC").  The charge indicated that she asserted age, gender, and disability as reasons for discrimination.  She described the circumstances of the alleged discrimination as follows:

I believe that I have been discriminated against on the basis of my condition.  I believe I was subjected to constant harassment because sex.  I also believe I was paid less than other managers who were younger than myself.

-10-

> No reason was given to me for the discrimination.
>
> I believe I have been discriminated against on the basis of my sex (female) . . . I further believe that I have been discriminated against on the basis of my [health] condition . . .

Dkt. # 61-22.  On March 2, 2007, the EEOC issued a "right to sue" letter under Title VII and the ADA.  *Id.*  On May 29, 2007, Plaintiff filed the instant complaint.

## II

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact.  *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).  The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts.  *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.

1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. "[T]he party opposing the summary judgment motion must do more than simply show that there is some metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quotations omitted)).

### III

#### A

Plaintiff maintains that her co-workers sexually explicit comments created a hostile work environment in violation of Michigan's Elliot-Larsen Civil Rights Act ("ELCRA").  Mich. Comp. Laws § 37.210 *et seq.*  Plaintiff contends that Defendant knew or should have known of Baird's inappropriate "conduct and communication."  A prima facie claim for hostile work environment pursuant to ELCRA requires a plaintiff to establish that she was subject to unwelcome sexual conduct or communication on the basis of her sex that was intended or, in fact, substantially interfered with her employment and respondeat superior liability of the employer.  *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000) (citation omitted).

Defendant challenges Plaintiff's ability to establish sexual harassment or communication directed towards her.   A plaintiff, in opposing a motion for summary judgment, must present evidence that a reasonable person, considering the totality of the circumstances, "would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Elezovic v. Bennett*, 731 N.W.2d 452, 461 (Mich. Ct. App. 2007) (citation omitted).  The Court is

to evaluate "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" to determine if it is sufficient to establish an objectively hostile work environment. *Quinto v. Cross and Peters Co.*, 547 N.W.2d 314, 320 n.9 (Mich. 1996) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). In *Elezovic*, for example, the plaintiff demonstrated a factual dispute by presenting evidence that her supervisor made multiple sexually explicit comments directed towards her and suggested she engage in sexual conduct with him. 731 N.W.2d at 462.

Here, Plaintiff has not demonstrated a hostile work environment. While Baird's initial description of his relationship with a minor was graphic, it was in response to Plaintiff's inquiry. In addition, Plaintiff believed that Baird was trying to convince her that he was innocent of the charges. With respect to Flynn, Plaintiff acknowledged that she overheard the conversation that the minor's father was "whoring" her out. While certainly offensive, Plaintiff does not allege that the conversations were directed at Plaintiff with the purpose of humiliating or threatening her. Plaintiff has not presented evidence of objectionable behavior, when viewed in the totality of circumstances, that a reasonable person would have perceived the conduct as substantially interfering with her employment.

Defendant also disputes its responsibility for the communications because it did not have notice of the behavior. "[P]rompt and appropriate remedial action" by an employer relieves the employer of liability in a hostile environment case. *Id.* (citation, quotation, and brackets omitted). "An employer, of course, must have notice of alleged harassment before being held liable for not implementing action." *Id.* (citation omitted). "[N]otice of sexual harassment is adequate if, by an

-13-

objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 919 (Mich. 2000) (citation omitted).

Defendant's sexual harassment policy directed employees to notify one's supervisor of harassing behavior. The supervisor was responsible for investigating the incident. As manager of the Midland store, Plaintiff was responsible for supervising employees and investigating incidents of harassment. Indeed, Plaintiff warned Flynn on three occasions. To the extent that Plaintiff was unable to address the problem, the policy required her to notify her supervisor. There is no indication that she communicated her personal concerns to her supervisor with respect to Flynn. While Plaintiff testified she informed the district manager of Baird's arrest, the record does not demonstrate, however, that she ever complained of Baird's conduct or communications at work. Plaintiff has not demonstrated that Defendant was aware of harassing behavior by Flynn or Baird. Thus, for both reasons, summary judgment should be granted in favor of Defendant with respect to the ELCRA claim.

B

Plaintiff alleges that she received lower wages than male counterparts in violation of the Equal Pay Act ("EPA"). 29 U.S.C. § 206(d)(1). A prima facie case of wage discrimination under the EPA requires a plaintiff must to "show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' " *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (citing 29 U.S.C. § 206(d)(1))). Affirmative defenses justifying a different salary include

-14-

that the employer utilized systems based on seniority, merit, or which measures earning by quantity or quality of production.  29 U.S.C. § 206(d)(1)  In addition an employer meets its burden if it demonstrates the decision was motivated by any factor other than gender.  *Id.*  At the summary judgment stage, an employer retains the burden to demonstrate that gender did not contribute to the wage differential.  *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005) (citation omitted).

Indeed, two male managers received higher annual base salary.  Defendant, however, produced evidence that each had more relevant experience than Plaintiff as a manager. Jendrzejewski had three more years experience and only earned an additional $1,020 a year, or approximately three percent annually.  Gronquist had five more years experienced and had advanced training in optometry.  In addition, Defendant's highest paid manager was female.  Plaintiff has not presented evidence rebutting Defendant's assertion that managerial salary was determined by experience and relevant qualifications, not gender.  Defendant is entitled to summary judgment with respect to the EPA claim.

## C

Plaintiff alleges that she was discharged on the basis of her gender, age, and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified at 42 U.S.C. § 2000e-2; the Age Discrimination Employment Act ("ADEA"), codified at 29 U.S.C. § 623(a)(1); the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. § 12101 *et seq.*; and Michigan's Peoples With Disabilities Civil Rights Act. codified at Mich. Comp. Laws 37.1101 *et seq.*  Plaintiff does not contend that she advanced direct evidence of age, gender, or disability discrimination; thus, the burden-shifting analysis of *McDonnell-Douglas* applies.  *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000).

-15-

Discrimination cases under Title VII, the ADEA, and ADA follow the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *Brenneman v. Med. Cent. Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004) (citation and internal quotations omitted). Likewise, the burden-shifting analysis under McDonnell Douglas applies equally to a parallel cause of action under the PWDCRA. *Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415, 437 n.26 (Mich. Ct. App. 2002). With respect to each of these claims, the first step is to evaluate whether a plaintiff is able to demonstrate a prima facie claim. If established, then the defendant may respond by offering a legitimate, non-discriminatory reason for its employment action. *Grosjean*, 349 F.3d at 335 (citation omitted). A plaintiff may rebut the non-discriminatory reason by demonstrating it is pretext for discrimination because the reason has no basis in fact, did not actually motivate the employer's action, or was insufficient to motivate the action. *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) (citations omitted).

I

Under Title VII, a prima facie case for sex discrimination consists of the plaintiff demonstrating the following elements: (1) the plaintiff was a member of a protected class, (2) the plaintiff suffered an adverse employment action, (3) the plaintiff was qualified for the position, and (4) that the plaintiff "was either replaced by someone outside the protected class or treated differently than similarly situated, non protected employees." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728 (6th Cir. 2004) (citation omitted). In the context of disciplinary action, "the plaintiff must show that the comparables are similarly-situated in all respects." *Id.* (citation and quotation omitted). In other words, "the individuals with whom the plaintiff seeks to compare his/her treatment must

-16-

have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

Defendant disputes Plaintiff's ability to identify a similarly-situated employee that received favorable treatment. Dkt. # 52 at 25 (citing *Noble*, 291 F.3d at 729). In response, Plaintiff raises the pay disparity between female and male managers and identifies Baird as the similarly-situated employee. First, a plaintiff may advance a claim under Title VII for unequal compensation that parallels an EPA claim. *Beck-Wilson v. Principi*, 441 F.3d 353, 369 (6th Cir. 2006). However, Title VII incorporates the EPA's affirmative defenses. *Id.* As discussed above, Plaintiff has not rebutted Defendant's affirmative defense. Thus, Plaintiff is unable to establish a prima facie Title VII claim for pay disparity.

Second, Baird does not constitute a similarly situated employee. While the record does demonstrate that Defendant retained him while the charge of sexual misconduct was pending, Baird's criminal conduct was not directed at or discussed with customers. Defendant contends it discharged Plaintiff for "aggressive and unprofessional" conduct in the presence of customers and colleagues. Although Plaintiff disputes the characterizations of the January 13 and 20 incidents, she does not dispute that those incidents generally occurred. Her situation differed from Baird's because the allegations of misconduct concern erratic behavior in front of customers. In addition, as manager, Plaintiff did not reprimand Baird, or inform superiors of Baird's allegedly harassing behavior. Thus, as more thoroughly discussed in the evaluation of Plaintiff's sexual harassment claim, there is no indication that the same supervisors were aware of Baird's arguably similar inappropriate conduct, but reacted differently. *See Noble*, 391 F.3d at 728. Ultimately, the record

-17-

does not support the proposition that Baird was similarly situated. For those reasons, Plaintiff has not demonstrated a prima facie claim under Title VII.

ii

The ADEA, at 29 U.S.C. § 623(a)(1), provides, "It shall be unlawful for an employer . . .to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...." First, a plaintiff must establish a prima facie case "by presenting evidence sufficient to create a reasonable inference that age was a determining factor in the employment decision." 1 Hon. Charles R. Rickey, Manual on Employment Discrimination Law and Civil Rights Actions in the Federal Courts § 3:100 (2d ed. 2008) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996)). To demonstrate a prima facie case for age discrimination, a plaintiff must demonstrate (1) that she is a member of a protected class (i.e. over the age of forty); (2) that she is qualified to perform the job; (3) that she was subject to an adverse employment action; and (4) that the employer replaced her with a younger individual. *Tuttle v. Metropolitan Government of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007). Here, Plaintiff has certainly established a prima facie claim of age discrimination because Defendant employed a significantly younger person to fill here position after Plaintiff's discharge.

iii

Under the ADA, a plaintiff establishes a prima facie case of disability discrimination by demonstrating: "(1) she is disabled; (2) she is otherwise qualified for the position with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) her employer knew or had reason to know of her disability; and (5) her position remained open." *Brenneman v.*

-18-

*Med. Cent. Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004) (citation and internal quotations omitted). The fifth element "may also be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir.1995).

First, Defendant disputes Plaintiff's ability to demonstrate that Defendant was aware of her alleged disability. Defendant acknowledges receiving a letter from Plaintiff's physician regarding her PTSD before she was informed of her discharge. While Defendant contends that it had previously determined to terminate her employment, a factual dispute remains with respect to this element.

Defendant's next argument requires more consideration. The ADA defines a "qualified individual" as a person "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "[A]n ADA plaintiff bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda America Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007) (citation and quotation omitted). A disability that subjects a plaintiff's attendance to "excessive absenteeism" is not "qualified to perform the essential functions of employment, as a matter of law. *Brenneman*, 366 F.3d at 418-19; *see also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir.1998) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA.").

Here, the record demonstrates that Plaintiff sought to be absent from work prospectively. The January 23 note from Plaintiff's physician did not indicate the expected duration of Plaintiff's absence, but indicated that she was unable to work because of "an outbreak of the PTSD symptoms." There is no indication of a history of absences prior to termination of employment, unlike the

plaintiff in *Brenneman* who had an extensive history of attendance problems before discharge. 366 F.3d at 419-20.

Notwithstanding that fact, the Plaintiff maintains the burden of demonstrating that she was able to work with accommodation. "[A]n employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) (citations omitted)."[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case-at least if she does not offer a sufficient explanation." *Williams v. London Util. Comm'n*, 375 F.3d 424, 429 (6th Cir. 2004) (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)). "This means that in order to survive a motion for summary judgment, the plaintiff's explanation must be sufficient to warrant a reasonable juror's concluding that the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Id.* (quotation omitted).

Here, Plaintiff denied that she could perform her past employment, maintain focus, or even be in public. Partly on the basis of that testimony, the state agency determined her to be disabled. She has not provided a "sufficient explanation" why she would be able to work in light of the representations in her worker's compensation proceedings. Thus, Plaintiff has not shown that she is a "qualified" individual under the ADA and Defendant is entitled to summary judgment.

iv

Notwithstanding the Court's conclusions with respect to Plaintiff's success in establishing prima facie claims, Plaintiff is nevertheless unable to meet the *McDonnell Douglas* burden-shifting test. Defendant asserts that it discharged Plaintiff for her conduct on January 20, 2006 and other

-20-

inappropriate interactions with customers.  Portions of the record clearly support Defendant's legitimate non-discriminatory justification for the termination.  First, Defendant's rules and regulations provided that "insulting, sarcastic, negative, angry words or attitude towards customers" may serve as a basis for discharge.  Plaintiff does not dispute that the January 20, 2006 incident occurred, but does dispute its characterization.  In addition, Defendant's auditor documented Plaintiff acting in an inappropriate manner to a customer on another day.  Defendant met its burden in advancing a legitimate, non-discriminatory justification.

Again, a plaintiff may rebut the non-discriminatory reason in three ways: the reason has no basis in fact, did not actually motivate the employer's action, or was insufficient to motivate the action.  *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) (citations omitted).  A plaintiff must offer "sufficient evidence to permit a reasonable jury to believe the plaintiff's explanation of intentional discrimination."  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728 (6th Cir. 2004) (citation and quotation omitted).

In response, Plaintiff offers her own testimony that her discharge was motivated by her age.  Plaintiff's mere assertion is insufficient to create a triable issue of fact.  Plaintiff also attacks the sufficiency of Defendant's investigation of her performance.  Plaintiff argues that Defendant relied on statements describing the incident by Plaintiff's co-workers that were not credible.  While Plaintiff surmises that her co-workers exaggerated events to have Plaintiff discharged, there is no indication that Defendant doubted the credibility of the description of events.  Nor does that contention support the conclusion that reports of misbehavior advanced by Plaintiff's colleagues were motivated by animosity towards Plaintiff's age.  In total, Plaintiff has not created a factual

-21-

dispute that Defendant's conclusion was pretext for age discrimination, or gender and disability discrimination either.

### D

The complaint alleges that Defendant adopted an employment "policy" to discharge employees only for good cause.  In contrast, Defendant contends that the employment contract was at-will.  As a general proposition, courts are to enforce an unambiguous contract provision as written.  *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 31 (Mich. 2005).  In the context of an employment contract, a prior oral agreement will not alter the terms of a later written contract because the employee assented to the terms of the written agreement.  *Novak v. Nationwide Mutual Ins. Co.*, 599 N.W.2d 546, 550 (Mich. Ct. App. 1999) (finding that the employer's oral statements did not modify an at-will employment contract into an implied just cause employment contract).

Here, neither party has provided a copy of an employment contract.  Defendant alleges that Plaintiff was employed at-will.  Under the summary judgment standard, the burden rests with Plaintiff to offer some evidence that an employment contract existed that permitted discharge for cause.  Plaintiff has not established a factual dispute that the employment relationship was at-will.  For the same reason, Plaintiff's wrongful discharge claim fails because she has not demonstrated that the employment relationship was not at-will.  *See Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880, 890 (Mich. 1980).

### E

Plaintiff also alleges Defendant's conduct amounts to negligent and intentional infliction of emotional distress under state law.  In Michigan, a plaintiff must demonstrate "conduct outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

-22-

regarded as atrocious, and utterly intolerable in a civilized community" to succeed under a theory for intentional infliction of emotional distress.  *Tope v. Howe*, 445 N.W.2d 452, 459-60 (Mich. Ct. App. 1989) (citation omitted).  "Damages for intentional infliction of emotional distress are not recoverable in an action for breach of an employment contract."  *Stopczynski v. Ford Motor Co.*, 503 N.W.2d 912, 915 (Mich. Ct. App. 1993) (citations omitted).  Here, Defendant has not demonstrated conduct that goes beyond all possible bounds of decency.  Moreover, her claim is impermissibly grounded in a claim for breach of contract. *See id.*

With respect to Plaintiff's Husband's claim for loss of consortium, the cause of action must fail because it depends on Plaintiff recovering on another theory.  *See Berryman v. Kmart Corp.*, 483 N.W.2d 642, 646 (Mich. Ct. App. 1992) ("A claim of loss of consortium is derivative and recovery is contingent upon the injured spouse's recovery of damages for the injury.").

IV

Plaintiff has not met her burden of demonstrating facts, conceding all reasonable inferences in her favor, that support the claims she has sought to advance.

Accordingly, it is **ORDERED** that  Defendant's motion for summary judgment [Dkt. # 52]is **GRANTED**.  Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 19, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 19, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS